1

2

3

4

5

6              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
7                      AT SEATTLE

8 _____
                                        )
9 THE CITY OF BOTHELL,                  )      No. C14-0791RSL
                                        )
10                     Plaintiff,       )
                                        )
      v.                                )
11                                      )      ORDER GRANTING IN PART
   BERKLEY REGIONAL SPECIALTY           )      CROSS-MOTIONS FOR
12 INSURANCE COMPANY,                   )      SUMMARY JUDGMENT
                                        )
13                     Defendant.       )
   _____)
14

15          This matter comes before the Court on "Plaintiff City of Bothell's Motion for

16 Partial Summary Judgment" (Dkt. # 9) and "Defendant's Cross Motion for Summary Judgment"

17 (Dkt. # 19).  The City alleges that it was an additional insured under an insurance policy issued

18 by defendant Berkley Regional Specialty Insurance Company ("BRSIC"), that BRSIC

19 improperly refused to defend or indemnify the City in an underlying tort action, and that BRSIC

20 violated various claims handling requirements in the process.  The City seeks partial summary

21 judgment establishing that BRSIC breached its duty to defend, acted in bad faith, and violated

22 the Washington Consumer Protection Act ("CPA") and the Insurance Fair Conduct Act

23 ("IFCA").  BRSIC seeks dismissal of all of the City's claims on the grounds that its coverage

24 determination was correct, there was no duty to defend, it acted in good faith as a matter of law,

25 and the City cannot satisfy the elements of a CPA or IFCA claim.

26          Summary judgment is appropriate if, viewing the evidence in the light most

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT

favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); L.A. Printex Indus., Inc. v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial."  Id. at 324.  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient:"  the opposing party must present probative evidence in support of its claim or defense.  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party."  In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (internal citations omitted).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds as follows:

## BACKGROUND

BRSIC issued a Commercial Lines Policy of insurance to Wickman Construction, LLC, the contractor on project to build a new driveway for EastLake Community Church in the City of Bothell.  Decl. of Adam Rosenberg (Dkt. # 10-1), Ex. E.  In order to obtain a permit for the project, the Bothell Municipal Code and the City's Design and Construction Standards required that the permittee, the developer, and/or the prime contractor obtain insurance in the amount of $1,000,000 per occurrence and provide proof that the City was an additional insured under the policy.  Decl. of Adam Rosenberg (Dkt. # 10), Ex. C. at § 1-5.3.  When Wickman attempted to schedule a meeting with an inspector from the City to discuss the project, he was told that the City had to receive proof of insurance before a meeting could be held.  Decl. of Roger Carter (Dkt. # 11), Ex. D.  Wickman promptly complied by providing a Certificate of

1   Liability Insurance, and the project went forward.  Decl. of Adam Rosenberg (Dkt. # 10-1), Ex.

2   E.

3          When the City inspected the project on February 14, 2011, it discovered that the

4   slope up to the inter-urban trail that crossed the new driveway exceeded permissible limits on the

5   north side and did not meet the plan specifications.  Decl. of Adam Rosenberg (Dkt. # 10-2 at

6   27), Ex. F.[1]  The church and Wickman were informed that the slope would have to be modified

7   and that, while it was fine to use the driveway, "the project can't be finaled until all the

8   requirements of the approved set of plans are met (correct grade, signage, gate, etc)."  Id.  The

9   City quickly realized that allowing the driveway to be used was a mistake and directed that it be

10  closed until the identified issues were resolved.  Decl. of Adam Rosenberg (Dkt. # 10-2 at 29),

11  Ex. F.  The engineers working with the church and Wickman suggested ripping out the steep, 6-

12  foot, concrete ramp and replacing it with a more gradual 31-foot ramp made of asphalt.  Decl. of

13  Adam Rosenberg (Dkt. # 10-2 at 31), Ex. F.  On June 30, 2011, the engineers notified the City

14  that the new asphalt ramp was in place and that it complied with the City's slope specifications,

15  stating "[w]e hope that this will close this matter and that the church can receive approval to use

16  the new driveway and gate."  Decl. of Adam Rosenberg (Dkt. # 10-2 at 33), Ex. F.

17         The City's inspector again visited the site on July 1, 2011, noting four issues that

18  had to be corrected before the project could be approved, including "Seal (AR4000) transition

19  asphalt."  Decl. of Adam Rosenberg (Dkt. # 10-2 at 35), Ex. F.  On July 6, 2011, a cyclist

20  crossing the driveway on the inter-urban trail hit the ramp on the south side[2] and was launched

---

22  [1] Exhibit F to the Declaration of Adam Rosenberg is the underlying tort complaint and attached
23  exhibits.

24  [2] It appears that the problems previously identified by the City and the corrective actions taken
    involved the north ramp connecting the driveway to the inter-urban trail.  Decl. of Adam Rosenberg
25  (Dkt. # 10-2 at 29), Ex. F.  The cyclist alleges that he was injured on the southern ramp (which is still
    depicted as concrete in the photos attached to the complaint).  Decl. of Adam Rosenberg (Dkt. # 10-2 at
26  9 and 22), Ex. F.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT          -3-

into the air, suffering injuries.  Two days later, the City's inspector sent the following message to

the church's representative:

> Hello Jeff,
>
> On Tues morning 7/5/11 I inspected the punch list items given to you on the Inspection Report and you have addressed all of the items on the punch list.  Dave Phelps has reviewed the letter dated 6/30/11 from DCI Engineers stating the driveway meets ADA slope requirements.  **I have Finaled the permit.**
>
> Regards,
>
> Roger Carter

Decl. of Roxanne Mussulman (Dkt. # 20), Ex. 5 (emphasis in original).  Within a week,

however, the City was asking the church and its engineer to "take another look at the path as it

was altered by the project, in the hopes of making the situation safer for future bicyclists and

pedestrians" and declared that "[w]e do not plan on finalizing the permit at this time."  Decl. of

Adam Rosenberg (Dkt. # 10-2 at 37), Ex. F.

       When the cyclist, Thomas Baker, filed a notice of claim with the City, it tendered

the claim to Wickman for further handling because (1) Wickman had agreed to indemnify,

defend, and hold the City harmless under the terms of the permit and (2) the City was an

additional insured under Wickman's Commercial Lines Policy.  Decl. of Adam Rosenberg (Dkt.

# 10-2), Ex. H.  The tender was forwarded to BRSIC, which stated that it had requested "a copy

of our insured's contract" from Wickman and would make a coverage determination after

receiving it.  Decl. of Adam Rosenberg (Dkt. # 10-2 at 46), Ex. I.  Three weeks later, BRSIC

declined to provide a defense.  After quoting one of the portions of the insurance policy that

defined "additional insured" and the scope of coverage,[3] BRSIC noted that:

---

[3] The "additional insured" provision on which BRSIC relied states that any entity for whom Wickman performed operations is an additional insured if Wickman and the other entity "have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy."  Covered property damage or bodily injury must arise "in the performance of [Wickman's

1
2
3
4
5
6

> Our insured has documentation that supports that he completed this project on or before June 13, 2011 and that the City finaled the project on July 5, 2011.  Both of these dates are prior to Mr. Baker's accident.  Additionally, it is highly questionable that our insured is responsible for this accident as he merely followed the design of DCI engineers who were hired by East Lake [sic] Community Church and the City inspected and approved the work.
>
> We must respectfully decline your tender of defense as the policy requires that the property damage occur during our insured's ongoing operations.

7
8

Decl. of Adam Rosenberg (Dkt. # 10-2 at 48), Ex. I.

9
10
11
12
13
14
15
16
17
18

        Mr. Baker and his wife filed a complaint for damages in September 2013 against the City, EastLake Community Church, DCI Engineers, and Wickman Construction.  The City again tendered its defense to BRSIC by letter dated October 8, 2013.  Decl. of Adam Rosenberg (Dkt. # 10-3), Ex. J.  The City attached a copy of Mr. Baker's complaint, which included allegations that "[t]he Bothell City Inspector did not give final approval to the driveway project" and "[o]n July 19, 2012 [sic] Bothell advised Wickman and ECC that the City was not finalizing the permit."  Decl. of Adam Rosenberg (Dkt. # 10-3), Ex. J at ¶¶ 46 and 51.  Although the letter was addressed to BRSIC's adjuster, Roxanne Mussulman, she did not receive it.  Decl. of Roxanne Mussulman (Dkt. # 20) at ¶ 20.[4]  She had, however, received a copy of a similar letter directed to Wickman.  Decl. of Roxanne Mussulman (Dkt. # 20) at ¶ 19.

19
20

        On November 6, 2013, the City again wrote to Ms. Mussulman:  "This letter is in follow-up to my October 8th correspondence.  To date, we have received no acceptance, or even

21

22
23
24
25

ongoing operations for the additional insured."  Property damage or bodily injury arising after (a) all work on the project has been completed or (b) the portion of the work out of which the injury or damage arises "has been put to its intended use by any person or organization other than another contractor or subcontractor" is not covered.  Decl. of Adam Rosenberg (Dkt. # 10-1 at 102), Ex. E.  The second additional insured provision contains slightly different language regarding the requisite contract and can be found at Decl. of Adam Rosenberg (Dkt. # 10-1 at 37), Ex. E.

26

    [4]  The letter apparently made it to the BRSIC claims department, but not to Ms. Mussulman.  Decl. of Roxanne Mussulman (Dkt. # 20) at ¶ 20.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT          -5-

1  acknowledgment, of our tender.  And in the meantime, the plaintiffs (and other parties) have

2  begun propounding discovery.  We would, again, ask that you provide the City a defense."

3  Decl. of Roxanne Mussulman (Dkt. # 20), Ex. 9.  The City received no response.  Despite the

4  fact that the letter was addressed and sent to Ms. Mussulman, she apparently thought the City

5  was requesting a defense from Wickman, not BRSIC, and ignored the letter.  Decl. of Roxanne

6  Mussulman (Dkt. # 20) at ¶ 21.  A December 9, 2013, follow-up letter threatened bad faith

7  litigation and specifically noted that "Berkley's unwillingness to so much as acknowledge our

8  repeated requests for a defense leave the City with little choice."  Decl. of Roxanne Mussulman

9  (Dkt. # 20), Ex. 11.  Ms. Mussulman persisted in her view that she had never received any tender

10  to BRSIC, but nevertheless felt compelled to refer the City to "our defense counsel's letter to

11  you dated 11/15/2013 (pdf attached).  Mr. Wraith has indeed responded to you on my behalf."

12  Decl. of Roxanne Mussulman (Dkt. # 20) at ¶ 23 and Ex. 12.  Mr. Wraith was counsel for

13  Wickman in the underlying litigation.  It was not until the City pointed out that BRSIC, as the

14  City's insurer, was in a very different position than Wickman, both legally and factually, that

15  Ms. Mussulman finally understood that the City considered itself an additional insured under the

16  policy and was tendering its defense.  Decl. of Roxanne Mussulman (Dkt. # 20) at ¶ 24.  Ms.

17  Mussulman promptly notified the City that additional insured status had been declined on

18  October 27, 2011, and attached a copy of the original denial letter.  Decl. of Roxanne

19  Mussulman (Dkt. # 20), Ex. 13.  When the City attempted to confirm that BRSIC was declining

20  to provide a defense based on the reasons identified in the 2011 letter, rather than the reasons put

21  forth by Wickman's defense counsel, Ms. Mussulman indicated that she was reviewing the

22  matter with her supervisor and would respond later.  Decl. of Adam Rosenberg (Dkt. # 10-3 at

23  86), Ex. P.

24        The City was not inclined to wait any longer and, on December 16, 2013, provided

25  the required 20-day notice of its intent to file a claim under IFCA.  Decl. of Adam Rosenberg

26  (Dkt. # 10-3), Ex. R.  On January 7, 2014, BRSIC again declined to provide a defense, this time

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT        -6-

1   on two new grounds:  that there was no "written contract or agreement signed by the named

2   insured under which the named insured agreed to provide additional insured coverage" for the

3   City and that "Mr. Baker was using that portion of the Trail for the purposes [for] which it was

4   intended."  Decl. of Adam Rosenberg (Dkt. # 10-3), Ex. S.  This action was filed on May 28,

5   2014.

6                                          DISCUSSION

7   **A.  Duty to Defend**

8               An insurer's duty to defend is triggered whenever the complaint, construed

9   liberally, alleges facts which could, if proven, impose a liability upon the insured that falls

10  within the policy's coverage provisions.  Truck Ins. Exch. v. Vanport Homes, Inc., 147 Wn.2d

11  751, 760 (2002).  The duty to defend is broader than the duty to indemnify:  "[w]hile the duty to

12  indemnify exists only if the policy covers the insured's liability, the duty to defend is triggered if

13  the insurance policy conceivably covers allegations in the complaint."  Expedia, Inc. v. Steadfast

14  Ins. Co., 180 Wn.2d 793, 803 (2014).  "It is a cornerstone of insurance law that an insurer may

15  never put its own interests ahead of its insured's."  Id. at 803.  Thus, if there is any doubt

16  regarding coverage, the insurer may not abandon its insured in the underlying litigation while the

17  indemnity determination is made.  Truck Ins. Exch., 147 Wn. at 761.  Rather, a defense must be

18  provided until it becomes clear in the underlying litigation or through a separate declaratory

19  judgment action that the claim is not covered by the policy.  Am. Best Food, Inc. v. Alea

20  London, Ltd., 168 Wn.2d 398, 404 (2010).

21              In order to determine whether the duty to defend has been triggered, the insurer

22  (and a reviewing court) generally looks to the underlying complaint and the insurance policy.

23  Id.  If the allegations of the complaint are so bare or ambiguous that it is unclear whether

24  coverage is conceivable or the allegations conflict with facts known or readily ascertainable by

25  the insurer, the insurer may consider extrinsic evidence.  Woo v. Fireman's Fund Ins. Co., 161

26  Wn.2d 43, 53-54 (2007).  The insurer may not, however, rely on facts extrinsic to the complaint

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT          -7-

1   to deny a request for a defense.  Reference to evidence outside of the complaint and the policy
2   may be used only to confirm that a defense is due.  Id. at 54.

3       **1.  Additional Insured Coverage**

4           The exceptions to the rule that the duty to defend is based solely on the allegations
5   of the underlying complaint and the policy provisions are narrow and favor the insured.  Id. at
6   53.  Nevertheless, courts have permitted the insurer to investigate whether the claimant is
7   actually an insured under the policy and to rely on their findings when rejecting a tender.  See
8   Allstate Prop. and Cas. Ins. Co. v. A.R., C13-6041RBL, 2014 WL 3579672, at *5-6 (W.D.
9   Wash. July 21, 2014); Hartford Fire Ins. Co. v. Leahy, 774 F. Supp.2d 1104, 1110-14 (W.D.
10  Wash. 2011); Scottish & York Int'l Ins. Group v. Ensign Ins. Co., 42 Wn. App. 158, 161-62
11  (1985).  See also Allan D. Windt, 1 Insurance Claims & Disputes, § 4.5 (5th ed. 2010) ("Before
12  the general principle regarding the duty to defend applies, it must be shown that the person
13  claiming coverage is, in fact, an insured.  The insurer has imposed upon itself a contractual duty
14  to defend its insured against suits alleging facts that, if proved, would constitute a risk insured
15  against under the provision of the policy.  It has not imposed upon itself a duty to defend a
16  complete stranger to the contract.").  For purposes of this motion, the Court will assume that
17  these cases accurately reflect Washington law and that BRSIC was entitled to investigate and
18  rely on extrinsic facts to determine whether the City were an additional insured.

19          BRSIC has offered a number of theories regarding what it takes to become an
20  additional insured under its policy.  When it denied the City's tender, BRSIC argued that a
21  contract signed by Wickman was a "necessary prerequisite to coverage under the endorsement."
22  Decl. of Roxanne Mussulman (Dkt. # 20), Ex. 15.  In opposing the City's motion for partial
23  summary judgment, BRSIC takes the position that Wickman must have affirmatively promised,
24  in writing, to provide the City with coverage.  Opposition (Dkt. # 19) at 13 (arguing that none of
25  the writings on which the City relies "contain a promise by Wickman to provide the City with
26  additional insured coverage").  In its reply memorandum, BRSIC argues that additional insured

coverage is triggered only if Wickman were subject to a contractual imperative to provide

insurance coverage to the City. See Reply (Dkt. # 30) at 1 (stating issue as "[d]id Wickman and

the City enter into a written contract requiring Wickman to provide the City with additional

insured insurance coverage for the driveway transition project?"). Neither the policy nor

Washington contract law support the imposition of these various requirements.

The "additional insured" provision on which BRSIC relied in its denial letters

defines an additional insured as any entity for whom Wickman performed operations as long as

Wickman and the other entity "have agreed in writing in a contract or agreement that such

person or organization be added as an additional insured on your policy." Decl. of Adam

Rosenberg (Dkt. # 10-1 at 102), Ex. E. A second provision defines additional insureds as "[a]ll

persons or organizations when additioanl [sic] insured stsaus [sic] is required by written contract

with you." Decl. of Adam Rosenberg (Dkt. # 10-1 at 37), Ex. E. The parties have not addressed

which of these provisions is operative, but the gist of both provisions is the same: a third-party

becomes an additional insured if there is a writing indicating that Wickman agrees that the third-

party is an additional insured. While neither a generic regulatory pronouncement nor an oral

agreement would trigger the additional insured coverage, there is no reason to presume that a

signature, a bilateral contract, or any other formality other than a writing indicating the mutual

intent of the parties to provide additional insurance coverage is required.

Under Washington law, a contract or agreement may be bilateral or unilateral.

Cook v. Johnson, 37 Wn.2d 19, 23 (1950). A bilateral agreement is formed by the exchange of

promises, along the lines of "X promises to work for Y, and Y promises to pay X $15 per hour

for the work." A bilateral contract is enforceable when made. A unilateral agreement, on the

other hand, consists of a promise by one party ("Y promises to pay X $15 per hour if X works

for Y") and subsequent acceptance by performance. All of the necessary terms are contained in

the offer or promise. Where the unilateral offer or promise is in writing, Washington courts have

found in the context of a statute of limitations analysis that the contract is a written agreement

1  despite the fact that performance is essential for providing consideration and evidencing mutual

2  assent.  DeBritz v. Sylvia, 21 Wn.2d 317, 327 (1944); Multicare Med. Ctr. v. State, 114 Wn.2d

3  572, 584 (1990), *overruled in other part by statute as stated in* Neah Bay Chamber of Commerce

4  v. Dep't of Fisheries, 119 Wn.2d 464 (1992).

5          In this case, the City promised to set up a necessary meeting with Wickman, the

6  project contractor, once it received proof that insurance coverage for the project would be

7  available to the City.  Wickman promptly satisfied the contingency, allowing the project to move

8  forward.  Decl. of Roger Carter (Dkt. # 11), Ex. D.[5]  BRSIC does not allege that Wickman did

9  not intend to grant the City additional insured status, that he misunderstood the nature of the

10  City's offer, or that he did not mean to assent to the offer through his performance.  Given the

11  backdrop of the municipal code, the design standards, and the parties' oral discussions, such

12  arguments would verge on the ridiculous.  Rather, BRSIC appears to rely on the fact that, when

13  it asked Wickman "whether he had a contract" with the City, he said no.  Decl. of Roxanne

14  Mussulman (Dkt. # 20) at ¶ 8.  That Wickman, a non-lawyer, was unaware of the intricacies of

15  Washington law related to unilateral contracts does not, however, mean that there was no mutual

16  intent and/or that a contract did not exist.  The City's written offer was clear, and Wickman's

17  performance gave rise to an enforceable agreement to provide insurance coverage for the project.

18  The City was, therefore, an additional insured under the policy.

19          The question then becomes whether the allegations of the Baker complaint could,

20  if proven, impose a liability upon the insured that falls within the policy's coverage provisions.

21  The allegations are construed liberally in favor of the insured, and any ambiguity is resolved in

22  favor of triggering the duty to defend.  In short, an insurer will not be "relieved of its duty to

23  defend unless the claim alleged in the complaint is clearly not covered by the policy."  Woo, 161

24

25          [5]  BRSIC simply refuses to acknowledge the existence of this email exchange, repeatedly
26  arguing that "there is no written document between Wickman and the City regarding additional
   insurance coverage."  Reply (Dkt. # 30) at 3.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT          -10-

Wn.2d at 53 (internal quotation marks and citations omitted).

**2. Completed Operations Provisions**

BRSIC argues that, if the City were held liable for the injuries Mr. Baker sustained, coverage would not be available under the policy because (a) Wickman had already completed his operations at the site and (b) the inter-urban trail had been opened to the public for its intended use, triggering an exclusion to the additional insured provision.  In order to reach the conclusion that Wickman had completed his work on the project, BRSIC improperly ignored allegations of the underlying complaint.  The complaint alleges that, five days before the accident, the City inspected the project and declined to give final approval, instead requiring additional work.  Decl. of Adam Rosenberg (Dkt. # 10-2), Ex. F at ¶ 46.  The complaint also alleges that, as of July 19, 2012, the City refused to finalize the permit.  Id. at ¶ 51.  At the very least, these allegations give rise to an inference that there was still work being performed on the project when the accident occurred.  BRSIC ignored these allegations, however, instead conducting an investigation to determine when Wickman had last performed work at the site, when the barricades had been picked up, and whether the City had ever "finaled" the permit.  Under Washington law, extrinsic facts cannot be used to reject a tender where the allegations of the complaint, construed liberally in favor of the insured, show that coverage is conceivable.

**3. Intended Use Exclusion**

With regards to the "intended use" exclusion, BRSIC has the better of the argument.  The policy provides coverage for bodily injury caused by the insured "in the performance of your ongoing operations for the additional insured," but specifically excludes injuries that occur after the portion of the work giving rise to the injury "has been put to its intended use by any person or organization other than another contractor or subcontractor" on the project.  Decl. of Adam Rosenberg (Dkt. # 10-1 at 102), Ex. E.  The gist of Mr. Baker's complaint is that the trail was prematurely opened for public use and that he was injured when he rode his bicycle downhill across the new driveway.  Mr. Baker had no role in the construction

project and was simply using the inter-urban trail as a member of the general public.  Nor is

there any allegations from which one could conclude that Mr. Baker skirted safety barriers, was

trespassing, or had otherwise extracted a use that was not, at the time, intended.  Looking only at

the allegations of the complaint, one would conclude that the ramps to and from the new

driveway had been opened for use and that Mr. Baker had used the trail and the new ramps as a

pedestrian and bicycle thoroughfare (*i.e.*, for its intended purpose).  Injuries resulting in such

circumstances are clearly not covered by the policy, and the duty to defend was not triggered.

        The City raises a number of arguments in an effort to show that the "intended use"

exclusion does not apply in these circumstances.  First, the City argues that the relevant intended

use was "a driveway in conformity with the plans and [constructed] in a manner which would

result in a driveway reasonably safe for its intended use by the public crossing over it."

Opposition (Dkt. # 26) at 10 (quoting the underlying complaint).  This argument proves too

much.  BRSIC agreed to insure Wickman and any additional insureds during construction, with

specified events signaling the end of its insuring obligations, namely (1) when all work was

completed and (2) when a portion of the project had been turned over and put to its intended use.

There is no indication that BRSIC intended to insure the quality of Wickman's work into the

future or to provide indemnification to the church or the City for injuries arising after the

specified events occurred.  The City's interpretation would keep BRSIC on the hook for an

indefinite period and force it to provide coverage whenever a user is injured because of a design

or construction defect, since a defective driveway was not the intended purpose of the work.

Such a conclusion would be illogical given the terms of the policy.  Second, the City posits that

virtually all injuries on the project will involve someone traversing the inter-urban trail, so if that

were the defined "intended use," coverage would be illusory.  The City's underlying assumption

is unsupportable.  Injuries could arise on the project in various ways:  contractors or

subcontractors may have an accident, a careless driver may overshoot the barricades, or

inspectors or trespassers could be injured on the site.  The mere fact of walking on what will

1    eventually be used as a trail does not exclude coverage.  Finally, the City argues that the

2    "intended use" provision, if interpreted as BRSIC suggests, is inconsistent with other provisions

3    of the policy.  There is no inconsistency.  While the most obvious cutoff for coverage under the

4    policy is when the contractor's operations on the project are completed, the policy also provides

5    that if portions of the project are put into service and someone is injured, there will be no

6    coverage even if the contractor is still working in other areas.  There is nothing inconsistent

7    about these provisions.

8           The Court finds that, although the City was an additional insured under the policy,

9    there is no coverage for the claims alleged in Mr. Baker's complaint because his injuries arose

10   after the trail had been opened to the public – rightly or wrongly – and put to its intended use.

11   There is therefore no duty to defend.

12   **B. Bad Faith**

13          An "insurer's duty of good faith is separate from its duty to indemnify if coverage

14   exists" and "an insured may maintain an action against the insurer for bad faith investigation of

15   the insured's claim and violation of the CPA regardless of whether the insurer was ultimately

16   correct in determining coverage did not exist."  Coventry Assocs. v. Am. States Ins. Co., 136

17   Wn.2d 269, 279 (1998).  "Coventry simply recognized the principles enunciated by the

18   legislature in chapter 48.01 RCW:  that the insurance business requires good faith, honesty, and

19   equity in all insurance matters."  St. Paul Fire and Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d

20   122, 131 (2008).  The City argues that BRSIC employed a series of tactics to avoid its coverage

21   obligations, putting its interests ahead of the insured and breaching the duty of good faith.  In

22   particular, the City argues that:

23          (1)  BRSIC denied additional insured status for the first time years after the City had first

24   made a claim under the policy and only after imposing requirements that are not found in the

25   policy;

26          (2)  most of the justifications BRSIC provided over the years for denying coverage were

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT          -13-

1   wrong on the facts or on the law;

2        (3)  BRSIC failed to timely respond to multiple requests for a defense in 2013;

3        (4)  BRSIC's review of the Baker complaint and subsequent investigation was one-sided,

4   undertaken for the purpose of finding and/or supporting a reason to deny coverage; and

5        (5)  BRSIC raised new grounds for denying coverage as time went on, only the last of

6   which had any merit.

7             Based on the facts as set forth above (and which BRSIC does not challenge), the

8   Court agrees.  Although it was ultimately correct in its coverage determination, BRSIC threw up

9   one reason after another, in serial fashion, why it should not have to defend the City.  At least

10  one of these justifications – that Wickman's liability was not assured – was nonsensical.

11  Another – that work on the project had been completed – involved ignoring allegations of the

12  underlying complaint and doing an investigation seemingly for the purpose of justifying a

13  coverage denial.  BRSIC's investigation regarding the City's additional insured status was

14  likewise defective:  without actually telling the City that its status as an "additional insured" was

15  at issue, BRSIC asked the City for a non-existent signed agreement and apparently expected

16  Wickman, a non-lawyer, to intuit what information the insurer needed and how Washington's

17  law of unilateral contracts applied.  BRSIC's reliance on the additional insured provision was

18  also rife with misrepresentations regarding what the provision required.  Finally, and only after

19  months of correspondence attempting to get an answer from BRSIC, the insurer hit upon the

20  "intended use" provision as justification for its denial.  While this justification is valid, a

21  thoughtful, impartial evaluation of the claim years earlier would have brought the provision to

22  the forefront and saved the City the time, aggravation, and expense of debunking all of the other,

23  meritless justifications.

24            BRSIC does not deny that any of these delays, misrepresentations, or serial

25  justifications occurred.  Rather, it suggests that the delays in responding to the City's tender

26  were simply the result of a misunderstanding, that the misrepresentations regarding the

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT        -14-

1   additional insured requirements were a scrivener's error, and that, having hit upon a valid

2   defense to coverage, there can be no bad faith claim.  To the extent Ms. Mussulman was

3   unaware that the City was seeking a defense from BRSIC in the fall of 2013, she should have

4   been aware of that fact by November 6, 2013, at the latest, when she received a letter, addressed

5   to BRSIC, specifically requesting that "you provide the City a defense."  If she were still

6   confused, she could have called the City's counsel to inquire regarding his intentions, rather than

7   making unjustified assumptions that delayed the insurer's responses well past the regulatory

8   deadlines.[6]  As for the assertion of a scrivener's error, the insistence that the written contract be

9   signed by Wickman is only one of a string of requirements superimposed upon the additional

10  insured provision.  BRSIC was clearly demanding a contract in the most formal sense of the

11  word:  a signed, bilateral, and integrated agreement.  These demands were unjustified, but that

12  does not make them scrivener's errors.  Finally, while it is true that denying coverage based on

13  the "intended use" provision cannot, standing alone, constitute bad faith, it is the unreasonable

14  delays in communication and the other justifications that were thrown up without adequate

15  investigation and/or in contravention of the basic tenets of Washington insurance law that the

16  Court finds to be unreasonable and unfounded.

17            BRSIC also alleges that the City has failed to prove any harm arising from the

18  alleged bad faith and is therefore not entitled to a declaration of liability.  As mentioned above,

19  however, had BRSIC conducted a thorough investigation and analysis of the City's claim in

20  2011, it likely would have realized that the "intended use" provision, as interpreted by BRSIC

21  and confirmed by the Court, precluded coverage.  The delay in coming to that realization caused

22  the City to expend time and resources attempting to respond to the various red herring arguments

23  BRSIC threw up over the years in an ultimately vain pursuit of coverage.  Some quantum of

24  damages has been shown.

25  _____

26  [6] The City's request for additional time in which to conduct discovery regarding Ms.
Mussulman's actual state of mind in the fall of 2013 is DENIED.

1    The Court finds that BRSIC acted in bad faith as a matter of law.  Issues related to

2  the amount of damages arising from its conduct are reserved.

3  **C.  Consumer Protection Act Claim**

4    The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts

5  or practices in the conduct of any trade or commerce."  RCW 19.86.020.  A private cause of

6  action exists under the CPA if (1) the conduct is unfair or deceptive, (2) occurs in trade or

7  commerce, (3) affects the public interest, and (4) causes injury (5) to plaintiff's business or

8  property.  Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780

9  (1986).  The City asserts that the same acts and practices discussed in the context of the bad

10  faith claim are "unfair or deceptive" for purposes of the CPA claim, that insurance impacts the

11  public interest, and that the City has suffered injury to its business or property in an as yet

12  unquantified amount.  The Court agrees, and finds that BRSIC violated the CPA as a matter of

13  law.  Issues related to the amount of injury to business or property arising from the unfair or

14  deceptive acts are reserved.

15  **D.  Insurance Fair Conduct Act Claim**

16    BRSIC argues that the City is precluded from bringing a claim under IFCA

17  because it is a third-party to Wickman's liability policy.  Regardless of whether the policy

18  provides first-party coverage (*i.e.*, a homeowner's policy which pays the insured when a loss

19  occurs) or third-party coverage (*i.e.*, a liability policy that pays a third-party on behalf of the

20  insured), IFCA provides anyone who has a right to file a claim under the insurance policy

21  (otherwise known as a first party claimant) with a cause of action against the insurer for

22  unreasonable coverage denials.  The City, as an additional insured, is a first party claimant under

23  the policy.  To the extent BRSIC unreasonably denied the claim on inapplicable and unsupported

24  grounds for more than two years, the City has established a claim under IFCA.

25

26

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT           -16-

1

**CONCLUSION**

2          For all of the foregoing reasons, the City's motion for summary judgment (Dkt.

3   # 9) is GRANTED in part and DENIED in part.  Although there is no duty to defend the

4   underlying action, BRSIC has engaged in unfair and bad faith claims handling practices, giving

5   rise to liability for bad faith and under the CPA and IFCA.  BRSIC's cross-motion for summary

6   judgment (Dkt. # 19) is also GRANTED in part and DENIED in part.  BRSIC's denial of

7   coverage under the "intended use" exclusion was correct, and it had no duty to defend or

8   indemnify the City in the underlying litigation.  Nevertheless, its claims handling procedures and

9   previous unjustified denials give rise to liability for bad faith and violations of the CPA and

10  IFCA.  All issues related to the amount of damages are reserved.

11

12          Dated this 10th day of October, 2014.

13          *Mnt S Casnik*

14          Robert S. Lasnik
            United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26